UNITED STATES BANKRUPTCY COURT       For Publication
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                  :
In re:                             :        Chapter 11
                                  :
WORLDCOM, INC., *et al.*,          :        Case No. 02-13533 (AJG)
                                  :
                                  :        (Jointly Administered)
                                  :
             Reorganized Debtors.     :        (Confirmed Case)
                                  :
-------------------------------------------------------------x
                                  :
WORLDCOM, INC. and             :
MCI WORLDCOM NETWORK SERVICES, INC.,:
                                  :
            Plaintiffs,          :
                                  :
            v.                  :        Adv. Pr. No. 04-02954 (AJG)
                                  :
PPL PRISM, LLC,                :
                                  :
                                  :
            Defendant.          :
                                  :
-------------------------------------------------------------x

**OPINION DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

A P P E A R A N C E S :

JENNER & BLOCK LLP
Attorneys for Reorganized Debtors, Plaintiffs[1]
601 Thirteenth Street, N.W.
Washington, DC 20005

           David A. Handzo, Esq.
              Of Counsel

HUNTON & WILLIAMS LLP
Attorneys for Defendant
200 Park Avenue, 43rd floor

---

[1] Jenner & Block LLP withdrew as counsel for the Plaintiffs in March 2006. It was replaced by DLA Piper Rudnick Gray Cary US LLP.

New York, NY 10166-0136

       Shawn Patrick Regan, Esq.
          Of Counsel

1751 Pinnacle Drive
McLean, VA 22102

       Bradley R. Duncan, Esq.
       Jerry L. Hall, Esq.
       Kimberly L. Nelson, Esq.
          Of Counsel

ARTHUR J. GONZALEZ
United States Bankruptcy Judge


     The telecommunications company MCI WorldCom Network Services, Inc.

("MCI," "WorldCom," the "Plaintiffs," or the "Debtors"), purchased an "indefeasible

right of use" ("IRU") of six fibers in the Baltimore area from Cambrian Communications,

LLC ("Cambrian").  Cambrian subsequently filed for bankruptcy and sold these fibers to

PPL Prism, LLC ("PPL").  MCI and PPL dispute their rights in the fibers.  In essence,

MCI claims that PPL should allow MCI to access and use the fibers, while PPL asserts

that it has no such duty.  Both parties moved for summary judgment.  Given the history

of the transactions and judicial proceedings among Cambrian, MCI, and PPL, the Court

holds that MCI has a right to access and use the fibers that is enforceable against PPL.

PPL's motion for summary judgment is therefore denied and MCI's motion for summary

judgment granted.

## JURISDICTION

     The Court has subject matter jurisdiction over this proceeding pursuant to sections

1334[2] and 157(b) of title 28 of the United States Code, under the July 10, 1984 "Standing

---

[2] Section 1334(e) provides the following:

Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for

the Southern District of New York (Ward, Acting C.J.), and under paragraph 32 of this

Court's Order Confirming Debtors' Modified Second Amended Joint Plan of

Reorganization under chapter 11 of title 11 of the United States Code (Oct. 31, 2003).

The Court has the power to decide core proceedings, which include matters concerning

the property of the estate.  28 U.S.C. § 157(b)(2)(E), (K), (M) (2000).[3]  Venue is properly

before this Court pursuant to section 1409 of title 28 of the United States Code.  The

parties do not dispute that the Court has jurisdiction, that the instant matter is a core

proceeding, and that venue is proper.  (Pls.' Compl. ¶¶ 6-8; Def.'s Answer ¶¶ 6-8.)

## FACTS

On or about June 4, 2002, MCI and Cambrian entered into an IRU Agreement and

a Maintenance Agreement (the "Agreements")[4] covering six fibers in the Baltimore area.

Under the IRU Agreement, MCI agreed to purchase from Cambrian a 20-year

"indefeasible right of use" of the fibers for a one-time $575,000 fee.  (IRU Agreement ¶¶

---

> The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction – –
>
> > (1) of all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate….

28 U.S.C. § 1334(e) (2000).

[3] Section 157(b)(2) contains the following relevant provisions:

> Core proceedings include, but are not limited to –
>
> > (E) orders to turn over property of the estate; …
> >
> > (K) determinations of the validity, extent, or priority of liens; …
> >
> > (M) orders approving the use or lease of property, including the use of cash collateral ….

28 U.S.C. § 157(b)(2)(E), (K), (M) (2000).

[4] Copies of the entire executed documents are available as Exhibits C and D to the Declaration of Cynthia A.  Jackson in Support of MCI's Motion for Summary Judgment, dated November 1, 2004.

1.06, 2.01, 4.01, Ex. B.)  Under the Maintenance Agreement, Cambrian agreed to maintain the fibers for the duration of the IRU Agreement and MCI agreed to pay a one-time $216,000 fee for "all routine, preventive and reactive maintenance" and a "proportionate share" of actual costs with a 20% mark-up for "unscheduled and emergency maintenance."  (Maintenance Agreement ¶¶ 1.01, 2.01, 3.01, 4.01; IRU Agreement ¶ 1.02.)

Starting on July 21, 2002, MCI and its affiliates filed for bankruptcy in this Court. On September 20, 2002, Cambrian filed for bankruptcy in the United States Bankruptcy Court for the Eastern District of Virginia (the "Virginia Court").  Cambrian's filing took place the day after MCI paid $791,000 to Cambrian, the total sum due under the IRU and Maintenance Agreements.

On or about February 6, 2003, PPL and Cambrian entered into an Asset Purchase Agreement "regarding the sale of substantially all of Cambrian's assets."  (Statement of Undisputed Facts in Supp. of Mot. of PPL Prism, LLC for Summ. J. ¶ 7; MCI's Resp. to PPL's Statement of Undisputed Facts as to Which There Is No Genuine Issue To Be Tried ¶ 7; Aff. in Supp. of Mot. of PPL Prism, LLC for Summ. J. ¶ 2, Ex. A.)  The sale included the fibers covered by the IRU Agreement, although MCI and PPL dispute the rights that each now enjoys in the fibers.  (Statement of Undisputed Facts in Supp. of Mot. of PPL Prism, LLC for Summ. J. ¶ 2, 17; MCI's Resp. to PPL's Statement of Undisputed Facts as to Which There Is No Genuine Issue To Be Tried ¶ 2, 17; Aff. in Supp. of Mot. of PPL Prism, LLC for Summ. J. ¶¶ 2, 7-8, Ex. A.)  An exhibit[5] to the Asset Purchase Agreement provided that Cambrian would attempt to reject the IRU

---

[5] MCI claims that Cambrian disclosed the existence and contents of this exhibit to the Asset Purchase Agreement only on September 8, 2003.  (Pls.' Mem. in Supp. of Summ. J. 12-13.)

Agreement, but would also alternatively seek additional compensation from MCI in exchange of assuming the IRU Agreement and assigning it to PPL.  (Aff. in Supp. of Mot. of PPL Prism, LLC for Summ. J. Ex. B.)  This additional compensation, if obtained from MCI, would be evenly split between Cambrian and PPL.  (Id.)  MCI refused to give additional compensation to Cambrian in exchange for assumption of the contract. Cambrian sought on February 12, 2003, authorization from the Virginia Court to implement the Asset Purchase Agreement and, on February 13, authorization to reject the IRU and Maintenance Agreements.

On March 12, 2003, MCI moved before this Court for a determination that the motion to reject the IRU and Maintenance Agreements, which Cambrian had filed in the Virginia Court, violated the automatic stay in the Debtors' chapter 11 cases.  Upon this request, this Court held the following:

> Pending further order of this Court, Cambrian shall not proceed with its motion to reject with respect to the portion of the IRU Agreement in which Cambrian agreed to transfer to WorldCom an exclusive beneficial ownership interest in and indefeasible right of use of six fibers (the "IRU Fibers").… Cambrian therefore may proceed with its motion to reject the IRU Agreement and the Maintenance Agreement, but only with respect to those portions of the Agreements that do not involve WorldCom's claim to hold an ownership interest in the IRU Fibers.
>
> This Order does not finally adjudicate the question of whether WorldCom or Cambrian presently holds the beneficial ownership interest in the IRU Fibers, and does not determine which is the appropriate court to determine that issue.

*In re WorldCom, Inc.*, No. 02-13533 (Bankr. S.D.N.Y. Apr. 29, 2003) (Order Regarding Debtors' Motion for an Order Adjudging and Determining Cambrian Communications LLC in Violation of the Automatic Stay).

On March 17, 2003, MCI filed a response in the Virginia Court to Cambrian's motion for approval of the Asset Purchase Agreement.  This submission did not object to the motion, but sought to explain "an understanding with Cambrian…."  (Resp. of MCI

WorldCom Network Services, Inc. to Mot. for Approval of Sale of Substantially All of
the Debtor's Assets Free and Clear of Liens, Claims and Encumbrances and to Approve
Conditional Assumption and Assignment of Certain Leases and Executory Contracts ¶
1.)[6]  The understanding was that "Cambrian would carve the WorldCom IRU out of the
sale agreement being reviewed by [the Virginia Court], so as to enable Cambrian to
proceed with the sale while at the same time preserving WorldCom's right to assert that
the IRU Agreement is not executory and that the IRU fibers cannot be sold free of
WorldCom's interest."  (Id. ¶ 4.)  Letters from counsel to MCI and Cambrian evidencing
the understanding were attached as an exhibit to the response.  (Id.)  The response also
clarified that "WorldCom's decision not to object to the sale of Cambrian's assets [was]
based on this understanding of what the sale will and will not encompass.  To the extent
that the sale of Cambrian's assets purported to include the WorldCom IRU or impair the
IRU in any way, WorldCom would object to the Sale Motion on that basis."  (Id. ¶ 5.)

On March 28, 2003, the Virginia Court granted the motion for approval of the
Asset Purchase Agreement and approved the asset sale, which Cambrian and PPL closed
on April 15, 2003.  In granting the motion, the Virginia Court also held the following:

> The Debtor [Cambrian] shall not assume or assign the IRU
> agreement…between the Debtor and MCI WorldCom Network Services,
> Inc. ("WorldCom") (the "WorldCom IRU Agreement") pursuant to this
> Order.  The Debtor and WorldCom reserve their respective rights with
> respect to the WorldCom IRU Agreement.  The Order shall not negate,
> impair or prejudice in any way the rights, claims or interests of WorldCom
> under the WorldCom IRU Agreement, nor constitute a sale free and clear
> of any such rights, claims or interests.  Nor shall this Order or the sale of
> assets approved pursuant to this Order impose any obligations on Buyer

---

[6] MCI and PPL did not submit this response to the Court.  They do, however, refer to it in their arguments.
(Statement of Undisputed Facts in Supp. of Mot. of PPL Prism, LLC for Summ. J. ¶ 12; MCI's Resp. to
PPL's Statement of Undisputed Facts as to Which There Is No Genuine Issue To Be Tried ¶ 12.)
Moreover, it is part of the public record in the Virginia Court.  *See In re Cambrian Commc'ns LLC*, No. 02-
84699 (Bankr. E.D. Va. Mar. 17, 2003) (Docket No. 229).

[PPL] with respect to the WorldCom IRU Agreement or the indefeasible right of use of fibers allegedly given to WorldCom under the WorldCom IRU Agreement.    The rights of all parties are reserved for further determination.

*In re Cambrian Commc'ns LLC*, No. 02-84699 (Bankr. E.D. Va. Mar. 28, 2003) (Corrected Order Granting Motion for Approval of Sale of Substantially All of the Debtor's Assets Free and Clear of Liens, Claims and Encumbrances and to Approve Conditional Assumption and Assignment of Certain Leases and Executory Contracts 20-21).

MCI subsequently offered to buy 12 additional fibers from PPL.

However, MCI indicated to PPL that, if this Court were to rule in MCI's favor, MCI intended to sell back to PPL MCI's rights in the six fibers covered by the IRU Agreement in exchange for a cash payment.  On May 30, 2003, an employee of PPL's wrote an e-mail to MCI stating that PPL was "not able to address the original IRU and the corresponding 6 fibers as they [did] not currently belong to PPLT [PPL Telcom][7] as part of the Asset Purchase."  (Decl. of Cynthia A. Jackson in Supp. of MCI's Mot. for Summ. J. Ex. L.)  On June 9, 2003, an employee of MCI responded to PPL that "then we only want the IRU for 6 fibers…and we will take our chances of owning the other 6 fibers when the court decision is made."  (Def.'s Answer ¶ 31.)  MCI and PPL agreed in July 2003 that MCI would buy rights to six additional fibers in a separate IRU agreement.

On August 5, 2003, MCI commenced an adversary proceeding against Cambrian in the Virginia Court, seeking a declaration that MCI had an exclusive beneficial ownership interest in the fibers covered by the June 2002 IRU Agreement.  *See* Declaratory Judgment Act, 28 U.S.C. § 2201 (2000).  The

---

[7] PPL Telcom is the parent of PPL Prism, LLC.  (Aff. in Supp. of Mot. of PPL Prism, LLC for Summ. J. ¶ 1.)

Virginia Court consented to a settlement of this proceeding and ordered the

following:

> …
>
> 2.    The Debtor [Cambrian] hereby is deemed to have
> abandoned any right, title, interest or claim to interest in the IRU
> Agreement, and the related IRU fibers described therein, to MCI.
> This Consent Order does not constitute an adjudication as to
> whether the Debtor has any such right, title, interest or claim to
> interests in the IRU Agreement, and the related IRU fibers
> described therein.
>
> 3.    The    Maintenance    Agreement    is    hereby    deemed
> REJECTED.
>
> ….

*In re Cambrian Commc'ns LLC*, No. 02-84699 (Bankr. E.D. Va. June 18, 2004)
(Consent Order Approving Settlement Between the Debtor and MCI WorldCom
Network Services, Inc.).

This settlement also provided that MCI would have an allowed general

unsecured claim resulting from the rejection of the Maintenance Agreement and

that Cambrian and MCI would release all other claims against each other.  *Id.*

As MCI had done in the Virginia Court, it initiated the instant proceeding

in this Court against PPL on April 9, 2004, seeking a declaration that MCI had an

exclusive beneficial ownership interest in the fibers covered by the June 2002

IRU Agreement.  On November 1, 2004, both PPL and MCI moved for summary

judgment.  A hearing regarding these motions was held on January 18, 2005.

## DISCUSSION

### *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to

bankruptcy proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure,

states that summary judgment should be granted if the record demonstrates that "there is

no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law." A fact is "material" if it "might affect the outcome of the suit under

governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine

issue" exists where "the evidence is such that a reasonable jury could return a verdict for

the non-moving party." *Id.* "When the movant demonstrates through competent

evidence that no material facts are genuinely in dispute, the non-movant must set forth

specific facts showing that there is a genuine issue for trial." *W. World Ins. Co. v. Stack

Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (internal quotation omitted); s*ee also Celotex

Corp. v. Catrett*, 477 U.S. 317, 323-325 (1986). The evidence must be "viewed in the

light most favorable to the party opposing the motion." *Terminate Control Corp. v.

Horowitz*, 28 F.3d 1335, 1352 (2d Cir. 1994) (citations omitted). Furthermore, the Court

must resolve all ambiguities and draw all reasonable inferences in favor of the non-

moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986).

Where, as here, a party has filed a cross-motion for summary judgment, the Court

must pay particular attention to the parties' respective burdens of proof, persuasion, and

production. When faced with a cross-motion for summary judgment, the court must

consider the merits of each motion independently of the other. *Heublein, Inc. v. United

States*, 996 F.2d 1455, 1461 (2d Cir. 1993). Although it may be implied from the filing

of a cross-motion that the parties have agreed that no material issues of fact exist, the

court is not bound by this implicit agreement and is not required to enter a judgment for

either party. *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001); *see also

9

*Aviall, Inc. v. Ryder System, Inc.*, 913 F.Supp. 826, 828 (S.D.N.Y. 1996), *aff'd*, 110 F.3d 892 (2d Cir. 1997). Moreover, "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublein*, 996 F.2d at 1461. When analyzing each motion, the court must be careful to view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Id.*

*Analysis*

The Court holds that MCI has an IRU enforceable against PPL and that this IRU includes a right to access the fibers for the limited purpose of enjoyment of the IRU.

**MCI's Enforceable IRU Against PPL**

(i) MCI's Contentions

"Plaintiffs seek a declaration from this Court that WorldCom has the exclusive beneficial ownership of and an indefeasible right of use of the IRU Fibers, and that these interests are property of the WorldCom bankruptcy estate." (Compl. ¶ 9.) In other words, MCI claims to have an enforceable ownership interest[8] in the fibers covered by the IRU Agreement. MCI also requests a declaration "that the [IRU] transfer is…non-executory…." (Id. ¶ 1, "Claim for Relief").

MCI argues that the grant of the IRU was fully completed because all contractual conditions to the transfer, namely fiber test results from PPL satisfactory to MCI, acceptance of the fibers by MCI and payment of consideration to PPL by MCI, were satisfied. (Id. ¶¶ 12, 18, 20-21.)

---

[8] The parties equate "ownership interest" with "property interest" and distinguish this type of interest from a "contractual interest."

MCI notes that the IRU Agreement made the provisions regarding the transfer of the IRU severable from the other provisions, and provided that a bankruptcy proceeding would not impair the IRU.  (Id. ¶ 15.)  Therefore, MCI argues that Cambrian's bankruptcy and the asset sale to PPL did not affect MCI's ownership interest in the fibers. MCI bolsters this point by noting that the Virginia Court's order approving the sale explicitly preserved this interest.  (Id. ¶ 26.)  Moreover, MCI points to the May 2003 e-mail from PPL to MCI in which a PPL employee allegedly admitted that the fibers in dispute did not belong to PPL, and asserts that PPL later "changed its position" by challenging MCI's interest in the fibers.  (Id. ¶¶ 31-32.)

MCI contends that "courts in this Circuit and elsewhere have consistently described IRU Agreements as conveying a property interest and not merely a contractual right of access."  (Pls.' Mem. in Supp. of Summ. J. 14.)  MCI cites *Western Union International v. FCC*, 568 F.2d 1012 (2d Cir. 1977), in which the Court equated an IRU with an "ownership interest."  568 F.2d at 1015 n.3.  MCI also cites *In re e.spire Communications, Inc., Securities Litigation*, 127 F. Supp. 2d 734 (D. Md. 2001), which considered IRUs as "leases of parts of the…fiber optic network."  127 F. Supp. 2d at 738 n.6.  According to MCI, "[l]egal commentators have also consistently argued that IRU[s] of the type at issue here convey an ownership interest."  (Pls.' Mem. in Supp. of Summ. J. 14.)  (citing Arun S. Subramanian, *Assessing the Rights of IRU Holders in Uncertain Times*, 103 Colum. L Rev. 2094 (2003); Michael J. Lichtenstein & Charles A. Rohe, *The Treatment of IRUs in Bankruptcy Proceedings*, 11 J. Bankr. L. & Prac. 83 (2001)).

MCI asserts that the language of the IRU Agreement itself makes the IRU a property interest.  (*See* IRU Agreement ¶¶ 2.01, 13.01, 25.02.)  MCI argues that "the

actual operation of the IRU" also makes it a property interest, especially the provisions granting MCI an exclusive right of use, determining the tax and accounting treatment of the IRU, and requiring MCI to provide electronic equipment to use the fibers.  (Pls.' Mem. in Supp. of Summ. J. 15.)

MCI admits Cambrian kept legal title to the fibers, but asserts that the IRU Agreement "made clear that MCI would be the legal owner of the fibers in every practical way, right down to paying the taxes on them and accounting for them as if they belonged to MCI." (Id. at 1.)

MCI points out that it "had the right to purchase the fibers at the end of their useful life – for the nominal amount of ten dollars."  (Id.)  MCI also notes that the parties expressly recognized that the IRU fee in the amount of $575,000 "reflect[ed] the fair market value" of the fibers.  (Id. at 4.)

MCI argues that the IRU Agreement "conveyed to MCI many of the legal rights that typically accompany property ownership."  (Id.)  Most importantly, MCI notes, the IRU Agreement granted MCI the "exclusive right of use" of the fibers.  (*See* IRU Agreement ¶ 13.01.)  The IRU Agreement also authorized MCI to use the fibers "for any lawful purpose."  (*See* id. ¶ 3.02.)

Citing *Coinmach Corp. v. Harton Associates*, 758 N.Y.S.2d 388 (N.Y. App. Div. 2003) and *Nextel of New York, Inc. v. Time Management Corp.*, 746 N.Y.S.2d 169 (N.Y. App. Div. 2002), MCI compares its interest under the IRU Agreement to an easement or lease.  MCI also considers the IRU grant to amount to a sale for a term of years.  *See Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744 (2d Cir. 1991).

MCI insists that, in any event, the IRU is a property interest, as opposed to a mere contractual interest, and that, as such, it runs with the fibers.  *See Reltron Corp. v. Voxakis Enters., Inc.*, 395 N.Y.S.2d 276, 279 (N.Y. App. Div. 1977) (purchaser with notice of a lease acquires property subject to the lease); *Strnad v. Brudnicki*, 606 N.Y.S.2d 913, 915 (N.Y. App. Div. 1994) (purchaser with notice of an easement acquires property subject to the easement).  MCI notes that, when they executed the Asset Purchase Agreement, Cambrian and PPL "made express provisions" about the IRU Agreement, thus showing that PPL had notice of MCI's IRU.  (Pls.' Reply Mem. in Supp. of Summ. J. 5.)

In the alternative, MCI argues that, even if the IRU Agreement conveyed only a contractual interest, the Virginia Court sale order and order approving the settlement between MCI and Cambrian preserved this interest.  (Pls.' Mem. in Supp. of Summ. J. 14 n.4.)  MCI concludes that PPL took Cambrian assets subject to this interest.  (Id.)

(ii) PPL's Assertions

On the other hand, PPL asserts that it fully owns the fibers.  (Def.'s Answer ¶¶32, 36.)  PPL contends that MCI's response to the motion for approval of the sale in the Virginia Court did not constitute an objection and "sought only to reserve MCI's ability to argue that the IRU Agreement is non-executory."  (Mem. in Supp. of Mot. of PPL Prism, LLC for Summ. J. 2-3.)

PPL does not dispute MCI's contentions as to the relationship between MCI and Cambrian, but "disagrees…that MCI has any ability to enforce against PPL the rights MCI thinks it has against Cambrian"  (Mem. in Supp. of Mot. of PPL Prism, LLC for Summ. J. 2.), because PPL never was a party to the IRU and Maintenance Agreements,

never assumed them, and thus cannot be bound by them.  (Resp. of PPL Prism, LLC to Pls.' Mot. for Summ. J. 4-5.)

PPL admits that "on May 30, 2003, a former sales representative of PPL Telcom, acting without authority to bind the company, stated the following in an e-mail to an employee of the Plaintiffs: 'As we discussed, PPLT [PPL Telcom] is not able to address the original IRU and the corresponding 6 fibers as they do not currently belong to PPLT as part of the Asset Purchase.'"  (Def.'s Answer ¶ 31.)

PPL argues that MCI's IRU is similar to the revocable license in *Todd v. Krolick*, 466 N.Y.S.2d 788 (N.Y. App. Div. 1983).  (Mem. in Supp. of Mot. of PPL Prism, LLC for Summ. J. 8-9.)  PPL says that, therefore, MCI's interest did not survive the sale of Cambrian's assets to PPL because PPL never explicitly assumed the IRU.  (Id.)

(iii) The Court's Determination

The IRU Agreement provides that, except with respect to choice of law rules, New York law governs the rights and obligations of the parties.  (IRU Agreement ¶ 20.01.)  Such a choice of law clause is enforceable in New York, where this Court is sitting.  *See, e.g., Cram v. Pepsico, Inc.*, 31 Fed. Appx. 39, 43 (2d Cir. 2002); *In re Enron Corp.*, 300 B.R. 201, 208 (Bankr. S.D.N.Y. 2003).

MCI's request for a declaration that the grant of the IRU is not executory need not be entertained because this issue is not before the Court.  Ruling generally on the legal nature of all IRUs is also unnecessary.  The Court need only determine the kind of interest MCI has in the fibers according to the June 2002 IRU Agreement, as interpreted under New York law, and ascertain whether this interest was preserved.

A. Nature of MCI's Interest Under the IRU Agreement

14

The IRU Agreement transferred "beneficial title and interest" in the fibers to MCI. (IRU Agreement ¶ 2.01.) Another provision calls MCI the "beneficial owner" of the fibers, "possessing equitable title" to them. (Id. ¶ 13.01.) Cambrian retained legal title to the fibers. (Id. ¶ 13.02.)

The notion of a "beneficial" or "equitable owner" is usually found in the areas of trusts or corporate law. *Black's Law Dictionary* 1130 (7th ed. 1999). A "beneficial owner" may be generally defined as "[o]ne recognized in equity as the owner of something because use and title belong to that person, even though legal title may belong to someone else…." *Id.*

No court has determined the precise legal nature of an IRU. Some decisions provide guidance. For instance, the Second Circuit described an IRU as an "ownership interest." *W. Union Int'l v. FCC*, 568 F.2d 1012, 1015 n.3 (2d Cir. 1977). Other courts have compared IRUs to leases. *See, e.g., In re e.spire Commc'ns, Inc., Sec. Litig.*, 127 F. Supp. 2d 734, 738 n.6 (D. Md. 2001); *Taft v. Ackermans*, No. 02 Civ. 7951, 2005 U.S. Dist. Lexis 6340, at *5 (S.D.N.Y. Apr. 12, 2005). Some tax cases have treated the acquisition of an IRU as a purchase. Lichtenstein & Rohe, *supra* at 86 n.9 (citing Rev. Rul. 73-77, 1973 C.B. 34; Rev. Rul. 69-2, 1969-1 C.B. 25). In 1975, the General Counsel's Office of the Internal Revenue Service drafted a ruling that "equated an IRU to ownership of electronic transmission channels." *Id.* at 86 n.10 (citing I.R.S. G.C.M. 36,334 (July 2, 1975), *available at* 1975 WL 37603).

Secondary legal sources have attempted to determine the contours of IRUs. An IRU can mix property and contract rights, and "[v]iewed from different angles, an IRU may appear to be a lease or sale of the assets underlying the IRU or simply a service

contract." Subramanian, *supra* at 2095; *see also* Lichtenstein & Rohe, *supra* at 83. A

court should decide that a particular IRU constitutes a property interest if the IRU

"identifies specific assets to be devoted to the IRU holder for a definite term…."

Subramanian, *supra* at 2097. Most importantly, an IRU represents a property interest if

"a right of use and economic possession are conveyed." *Id.* at 2109.

Legal doctrine has attempted to distinguish among various types of IRUs,

depending on whether the grantee of the IRU must provide the electronic equipment

necessary to use the fibers ("dark fiber IRU") or not ("lit fiber IRU"). *Id.* at 2099. A

third type ("wave IRU") gives "the right to use particular wavelengths within a lit fiber

strand…or an absolute amount of bandwidth flowing between two geographic points…."

*Id.* at 2099-2100. Some authors think that dark fiber IRUs "are easy to conceptualize as

sales." Lichtenstein & Rohe, *supra* at 86. This analogy to a sale seems valid even if a

separate agreement provides for maintenance by the grantor of the IRU. *Id.* at 88.

Passages in the IRU Agreement imply a sale or at least the transfer of a property

interest. The recitals section of the IRU Agreement states that "Cambrian desires to *sell*

to WorldCom and WorldCom desires to *purchase* from Cambrian the *exclusive right to*

*use* certain fibers…" (IRU Agreement at 1 (emphases added).) The Agreement further

provides that "upon WorldCom's final acceptance of the WorldCom Fibers, Cambrian

shall *sell, convey, transfer, assign and deliver* to WorldCom and WorldCom shall accept

and *acquire* from Cambrian all of Cambrian's *beneficial title and interest* in and to the

WorldCom Fibers, including without limitation an exclusive, indefeasible right of use in

the WorldCom Fibers ('IRU')." (Id. ¶ 2.01 (emphases added).) MCI is to be considered

as "the absolute owner." (Id. ¶ 13.01.) The Agreement even speaks of an "ownership interest" in the fibers. (Id. ¶ 25.02.)

Further, the Agreement not only repeatedly calls the IRU "exclusive." (Id. at 1, ¶¶ 2.01, 13.01, 25.02.) It also provides that MCI will act as an owner of the fibers for accounting and tax purposes. (Id. ¶ 13.01, 13.03.) MCI's IRU falls into the "dark fiber" category because MCI must provide the equipment necessary to use specific fibers. (Id. ¶ 9.03.)

Additionally, Cambrian's invoice charges MCI for the IRU "for a *lease* term of 20 years." (Decl. of Cynthia A. Jackson in Supp. of MCI's Mot. for Summ. J. Ex. K) (emphasis added). The IRU fee of $575,000 represents "the fair market value" of the fibers. (IRU Agreement ¶ 4.01.) MCI had the option of purchasing legal title to the fibers at the end of the 20-year term for ten dollars. (Id. ¶ 5.03)

The parties dispute which legal concept best describes MCI's IRU. Citing *Todd v. Krolick*, 466 N.Y.S.2d 788 (N.Y. App. Div. 1983), PPL argues that MCI's IRU is akin to a revocable license. (Mem. in Supp. of Mot. of PPL Prism, LLC for Summ. J. 8-9.) MCI deems *Todd* distinguishable because "[i]n that case, although the agreement provided plaintiff with a right to use certain space for its washing machines, it did not provide plaintiff with an *exclusive* right to use that space." (Pls.' Mem. in Opp'n to PPL's Mot. for Summ. J. n.1.)

In *Todd*, the Appellate Division held that "the contract…was in the nature of a license rather than a lease or an easement" because "[t]he agreement did not give plaintiff exclusive possession and control of any definite space…." *Todd*, 466 N.Y.S.2d 788 at 790. This "revocable license…was extinguished by the conveyance of the property"

absent express assumption of the license by the transferee. *Id.* at 789. For an easement to exist, there should have been "a description of the [property] that is to be subject to the easement with sufficient clarity to locate it with reasonable certainty…." *Id.* at 790.

The IRU Agreement precisely identifies the fibers subject to the IRU. The results of the tests by Cambrian before formal acceptance by MCI also singled out these fibers. Moreover, the right to use the fibers is exclusive to MCI. Therefore, MCI's IRU is not a license.

MCI's interest is an ownership interest closer to an easement or a lease. In *Coinmach Corp. v. Harton Associates*, 758 N.Y.S.2d 388 (N.Y. App. Div. 2003), the Court identified "a lease rather than a license" because the agreement "contained a description of the specific premises to be occupied by plaintiff, specified the amount of rent to be paid, and provided for the plaintiff's exclusive use and occupancy for a fixed period of time…." *Coinmach*, 758 N.Y.S.2d at 389; *see also Nextel of New York, Inc. v. Time Management Corp.*, 746 N.Y.S.2d 169, 170 (N.Y. App. Div. 2002). In the instant matter, MCI's IRU represents an exclusive right to use specific fibers for a determinate price and definite duration.

The concept of sale for a term of years even more aptly describes MCI's interest in the fibers because, but for the ten-dollar payment necessary to acquire title at the end of the agreement term, MCI prepaid for the IRU. *See Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 751 (2d Cir. 1991). In *Rensselaer*, the Court also examined an agreement "resembl[ing] an amalgam or hybrid, apparently containing characteristics of both a lease and a sale of property with rights retained in the grantor." *Id.* at 750. As in the instant matter, the grantor of the interest "wished to receive many of

the benefits of a sale of property, such as an early payment, with certain benefits of a lease, such as a continued exercise of a degree of control over the property….” *Id.*

In any event, the relevant contractual provisions and property law principles converge to enable the Court to conclude that MCI's IRU is a property interest, not a mere contractual interest. The Court must now decide whether this interest has been preserved.

B. Preservation of MCI's Interest Under the IRU Agreement

Under the IRU Agreement, the grant of the IRU to MCI "shall become effective…on the first day when both (i) the [sic] WorldCom has delivered a Notice of Acceptance pursuant to Article VII; and (ii) Cambrian has received payment in full of the IRU Fee." (IRU Agreement ¶ 5.01.) After satisfactory testing of the fibers, MCI delivered a Notice of Acceptance. (Decl. of Cynthia A. Jackson in Supp. of MCI's Mot. for Summ. J. ¶ 21, Ex. J.) Cambrian did receive full payment for the IRU. (Statement of Undisputed Facts in Supp. of Mot. of PPL Prism, LLC for Summ. J. ¶ 6.) Therefore, MCI received the IRU upon satisfaction of the two contractual conditions.

Cambrian kept legal title to the fibers. (IRU Agreement ¶ 13.02.) Therefore, PPL acquired legal title from Cambrian pursuant to the Asset Purchase Agreement. The May 2003 e-mail from PPL to MCI, in which an employee of PPL's went as far as to deny that PPL owned the fibers covered by the IRU, casts serious doubts on PPL's claim to full ownership of the fibers.

Further, a purchaser with notice of a preexisting interest in the property, such as a lease or an easement, takes the property subject to this interest. *Reltron Corp. v Voxakis Enters., Inc.* 395 N.Y.S.2d 276, 279 (N.Y. App. Div. 1977) (lease); *Strnad v. Brudnicki*,

606 N.Y.S.2d 913, 915 (N.Y. App. Div. 1994) (easement).  PPL and Cambrian agreed

that Cambrian would attempt to reject the IRU unless MCI paid additional sums.  (Aff. in

Supp. of Mot. of PPL Prism, LLC for Summ. J. Ex. B.)  Therefore, PPL had notice of the

IRU.  This notice is sufficient and MCI's rights are enforceable against PPL even though

PPL was not a party to the IRU Agreement.

PPL incorrectly argues that MCI's response to Cambrian's motion for approval of

the sale only preserved MCI's argument that the IRU Agreement is not executory.  As

written previously, MCI did not object to the motion because of an understanding with

Cambrian that the IRU would be preserved.  The Virginia Court preserved MCI's IRU by

holding that the sale of Cambrian's assets to PPL "shall not negate, impair or prejudice in

any way the rights, claims or interests of WorldCom under the WorldCom IRU

Agreement, nor constitute a sale free and clear of any such rights, claims or interests."  *In

re Cambrian Commc'ns LLC*, No. 02-84699 (Bankr. E.D. Va. Mar. 28, 2003) (order

approving sale).  Thus, PPL acquired the fibers subject to MCI's IRU.

The IRU Agreement makes its provisions concerning the transfer of the IRU

severable.  (IRU Agreement ¶¶ 4.01, 25.03.)  This severability does not impact the nature

of MCI's IRU as a property interest.

The IRU Agreement also provides that Cambrian's bankruptcy is supposed to

leave the IRU unaffected.  (Id. ¶ 25.02.)  This provision does not affect the IRU either.

State law determines property rights in the bankruptcy process.  *Butner v. United States*,

440 U.S. 48, 54 (1979).  Therefore, the provision merely restates the basic principle that

rights determined by state law, which include property rights, remain the same both

inside and outside of bankruptcy.  *Chicago Board of Trade v. Johnson*, 264 U.S. 1, 8, 12

20

(1924); *In re Drexel Burnham Lambert Group, Inc.*, 120 B.R. 724, 735-736 (Bankr.

S.D.N.Y. 1990).

In sum, MCI's IRU is a property interest enforceable against PPL.  The parties

disagree as to whether this interest includes a right to access the fibers.  The Court holds

that MCI has such a right for the purpose of enjoyment of the IRU.

**MCI's Right to Access the Fibers**

(i) Parties' Contentions

MCI asserts that PPL should not interfere with MCI's access to the fibers.  MCI

claims it can identify the fibers and access them without any assistance from PPL

(Compl. ¶ 22) by using information from exhibits to the IRU Agreement and fiber-testing

data provided by Cambrian to MCI before MCI and Cambrian executed the IRU

Agreement.  (Pls.' Mem. in Supp. of Summ. J. 6-10; Statement of Undisputed Facts in

Supp. of Mot. of PPL Prism, LLC for Summ. J. Ex. A 14-15; Decl. of George Mohrmann

in Supp. of MCI's Mot. for Summ. J.)  MCI also argues that Cambrian abandoned any

right to control access to the fibers when Cambrian settled the adversary proceeding in

the Virginia Court.

PPL argues that MCI never had the right to access the fibers.  PPL notes that

"MCI focuses…on…its technical ability to light the Fibers" and admits that "MCI's

personnel possess the technical wherewithal to do the things that MCI wants to do."

(Resp. of PPL Prism, LLC to Pls.' Mot. for Summ. J. 4.)  PPL, however, points out that,

under both Agreements, Cambrian retained the exclusive right to access and maintain the

fibers.  (Id. at 3.  *See also* IRU Agreement Art. VIII.)  Therefore, PPL argues, MCI

cannot now enforce against PPL an alleged right that MCI did not have against

Cambrian.  (Resp. of PPL Prism, LLC to Pls.' Mot. for Summ. J. 3.)

Assuming MCI had the right to access, PPL contends that it cannot be enforced

against PPL because PPL is a party neither to the IRU Agreement nor to the Maintenance

Agreement.  PPL suggests that MCI has a claim against Cambrian for not only rejection

of the Maintenance Agreement, but also MCI's inability to have the fibers maintained by

anybody but PPL.  (Transcript of Oral Argument at 20, *In re WorldCom, Inc.*, No. 02-

13533 (Bankr. S.D.N.Y. Jan. 18, 2005)).

PPL notes and MCI does admit that Cambrian rejected the Maintenance

Agreement.  (Resp. of PPL Prism, LLC to Pls.' Mot. for Summ. J. at 3.  S*ee also In re*

*Cambrian Commc'ns LLC*, No. 02-84699 ¶ 3 (Bankr. E.D. Va. June 18, 2004) (Consent

Order Approving Settlement Between the Debtor and MCI WorldCom Network Services,

Inc.))  Thus, PPL asserts that MCI does not have a right to demand maintenance of the

fibers by PPL. (Resp. of PPL Prism, LLC to Pls.' Mot. for Summ. J. 3-4.)

MCI explains that PPL's argument can be examined in two different ways.  First,

if Article VIII of the IRU Agreement regarding access to the fibers embodies "a property

interest that Cambrian did not sell to MCI but instead reserved to itself in the IRU

Agreement" (Pls.' Reply Mem. in Supp. of Summ. J. 6-7), then, MCI reasons, "PPL

acquired both the right to control the time and place of access, and the duty to undertake

the work necessary to provide access."  (Id. at 7.)  MCI thinks it unconceivable for PPL

"to have acquired a property interest that Cambrian did not have – the right to exclude

MCI entirely from access to its fiber."  (Id.)  Furthermore, MCI argues "New York

law…will imply into any transfer of a property interest all rights necessary for the buyer

to use what he or she bought." (Id.) MCI gives the example of an easement by necessity

to the benefit of a buyer of land. *See Resk v. City of New York*, 741 N.Y.S.2d 265, 266

(N.Y. App. Div. 2002).

Second, Article VIII can be interpreted as providing only for "a contractual

arrangement between MCI and Cambrian that allocated between them the tasks necessary

for MCI to make use of its fiber." (Pls.' Reply Mem. in Supp. of Summ. J. 8.) MCI

deems this interpretation more plausible because the IRU Agreement makes the language

granting the IRU severable from its other provisions, including Article VIII. (Id. at 8

n.4.)

MCI notes that Cambrian abandoned its rights under the IRU Agreement pursuant

to the settlement agreement approved by the Virginia Court. Therefore, MCI asserts,

"[w]hatever contractual rights and obligations Cambrian had, MCI now has." (Id. at 8.)

MCI believes that one of these "rights…Cambrian had" is the right to maintain the fibers,

which was preserved by the Virginia Court order approving the sale of Cambrian's assets

to PPL. (Id. at 9-10.) MCI does not claim, however, to have any right to demand

performance from PPL. (Id. at 8.) "MCI only wants PPL to stand aside…." and let MCI

itself do the maintenance work. (Id. at 8-9.)

MCI finally argues that, to control access to the fibers, PPL could have assumed

Cambrian's maintenance obligations and exclusive right of access. (Tr. 27.) PPL,

however, did not choose to do so. (Id.)

(ii) The Court's Determination

The Maintenance Agreement reserved access to the fibers to Cambrian. (IRU

Agreement Art. VIII.) Cambrian was in charge of maintaining the fibers. (Maintenance

Agreement Art. 3.)  However, the Maintenance Agreement also provided the following:

"In the event Cambrian fails to commence…maintenance within four (4) hours of

notification by WorldCom that such maintenance is required, WorldCom will have the

right to perform the maintenance at Cambrian's sole cost and expense."  (Maintenance

Agreement, Ex. A.)

This language demonstrates that Cambrian and MCI envisaged the possibility that

MCI itself could access the fibers and perform maintenance if Cambrian failed to do so.

Thus, the Maintenance Agreement was only, in MCI's words, "a contractual

arrangement" (Pls.' Reply Mem. in Supp. of Summ. J. 8.) as to who would actually

perform maintenance, without precluding MCI from ever accessing the fibers or

performing maintenance on them.

As a result, when Cambrian and MCI agreed in their settlement agreement that

Cambrian would reject the Maintenance Agreement, MCI's claim for $216,000

represented the maintenance services Cambrian would not perform as promised and

nothing more.  Contrary to PPL's argument, MCI never had a right to additional damages

from Cambrian because the fibers would remain idle unless PPL granted MCI access to

them.

Even assuming Cambrian retained the exclusive right to access the fibers,

such a right was abandoned as a result of the settlement between MCI and

Cambrian approved by the Virginia Court.  *In re Cambrian Commc'ns LLC*, No.

02-84699 ¶ 2 (Bankr. E.D. Va. June 18, 2004) (order approving settlement).

Moreover, denying any right of access to the fibers to MCI would amount to

rendering the IRU nugatory.  In *Resk v. City of New York*, 741 N.Y.S.2d 265 (N.Y. App.

Div. 2002), the Court found an easement by necessity because such an easement was "reasonable for the normal development of the [property]" and "not…a mere convenience." *Resk*, 741 N.Y.S.2d at 266. The same reasoning can be applied to the fibers at issue. The Court does not hold that MCI's IRU is an easement by necessity, but that MCI has a right to access the fibers enforceable against PPL for the limited purpose of enjoyment of the IRU.

MCI certainly cannot require PPL to perform maintenance on the fibers because Cambrian rejected the Maintenance Agreement and PPL never assumed any obligation under this Agreement. However, as written above, the IRU is a property interest that runs with the fibers and is enforceable against PPL even if PPL was not a party to the IRU Agreement or the Maintenance Agreement. As the right to access accompanies the IRU, it also runs with the fibers and is enforceable against PPL insofar as PPL should not interfere with MCI's enjoyment of the IRU.

## CONCLUSION

PPL's motion for summary judgment is denied and MCI's motion for summary judgment granted. MCI shall settle an order consistent with this opinion.

Dated: New York, New York
         May 16, 2006

                                        **s/Arthur J. Gonzalez**
                                         UNITED STATES BANKRUPTCY JUDGE